**\*NOT FOR PUBLICATION\***

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **DAVID BONO**, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | :  Civ. Action No.: 15-6326 (FLW)(DEA) |
| | : |
| **DANIEL J. O'CONNOR, DAVID J.** | :  **OPINION** |
| **MAURO, SAMIR KHLEIF, ROBERT** | : |
| **G. PETIT, RONI A. APPEL, RICHARD** | : |
| **J. BERMAN, THOMAS J. MCKEARN,** | : |
| **JAMES P. PATTON, DAVID** | : |
| **SIDRANSKY, SARA M. BONSTEIN,** | : |
| **GREGORY T. MAYES**, and **ADVAXIS,** | : |
| **INC.,** | : |
| | : |
| Defendants. | : |

Plaintiff David Bono ("Plaintiff"), a shareholder of Advaxis, Inc. ("Advaxis" or the "Company"), brings this shareholder derivative action on behalf of Advaxis, against the directors and officers of Advaxis[1] (collectively, "Defendants") for allegedly "spring-loading"[2] stock options. Plaintiff asserts claims against Defendants for violation of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 14a-9 promulgated thereunder;

---

[1] Plaintiff brings claims against the following Advaxis directors and officers: Daniel J. O'Conner ("O'Conner"), David J. Mauro ("Mauro"), Samir Khleif ("Khleif"), Robert G. Petit ("Petit"), Roni A. Appel ("Appel"), Richard J. Berman ("Berman"), Thomas J. Mckearn ("McKearn"), James P. Patton ("Patton"), David Sidransky ("Sidransky"), Sara M. Bonstein ("Bonstein"), and Gregory T. Mayes ("Mayes").

[2] According to the Complaint, "'[s]pring-loading'" takes place when an individual receives stock options immediately before the release of positive news about the company. When the company announces the positive news, its stock price increases, giving the recipient of the spring-loaded stock options an immediate paper profit . . . ." Compl. ¶ 2

as well as state law claims for breach of fiduciary duty, waste of corporate assets, and unjust enrichment. In the present matter, Defendants move to dismiss the Complaint for failure to state a claim, or in the alternative, dismiss or stay Plaintiff's state law claims, pursuant to the *Colorado River* abstention doctrine.

For the following reasons, the motion to dismiss is granted in part and denied in part, and the motion to dismiss or stay, pursuant to the *Colorado River* abstention doctrine, is denied.

## I.   Procedural and Factual Background

The following allegations are taken from the Complaint and are assumed as true for the purposes of review under Fed. R. Civ. P. 12(b)(6).

Advaxis is a publically held clinical stage biotechnology company, incorporated in Delaware, with its principal offices in Princeton, New Jersey. Compl. ¶¶ 16, 84. The Company's business focuses on the development and commercialization of cancer immunotherapies based on its proprietary Lm-LLO (Listeria-like organisms) platform. *Id.* at ¶ 16. The following defendants are directors on the Advaxis Board of Directors (the "Board"): O'Conner, Khleif, Appel, Berman, McKearn, Patton, and Sidransky (collectively, "Director Defendants"). *Id.* at ¶¶ 17-28. In addition, the following defendants are Advaxis officers: O'Conner, Mauro, Petit, Bonstein, and Mayes (collectively, "Officer Defendants"). *Id.* at ¶¶ 17-28.

On March 30, 2015, the Board adopted, subject to subsequent shareholder approval, a new equity incentive plan (the "2015 Plan") to replace the Company's then-current equity incentive plan (the "2011 Plan").[3] *Id.* at ¶ 3. The same day, under the new 2015 Plan, the Compensation Committee of the Board granted over 1.56 million stock options and nearly

---

[3] These equity incentive plans set aside a pool of shares from which the Compensation Committee of the Board could issue equity grants to directors and employees of Advaxis, pursuant to certain limitations.

155,000 restricted stock units ("RSUs") of Advaxis stock (the "2015 Awards") to Advaxis' directors and officers, contingent on subsequent stockholder approval of the 2015 Plan. *Id.* at ¶ 3. The following Director Defendants were members of the Compensation Committee at the time the 2015 Awards were issued: Appel, Berman, and Sidransky (collectively, the "Committee Defendants"). *Id.* at ¶¶ 21-22, 25.

Plaintiff claims that the 2015 Awards were a "drastic break" from the compensation practices previously adopted by the Compensation Committee. *Id.* at ¶ 3. Specifically, Plaintiff alleges that in 2013, the Compensation Committee adopted a compensation strategy (the "2013 Compensation Policy"),[4] which directed that each non-employee Advaxis director would receive yearly compensation of $100,000 at the start of the fiscal year, in either cash or equity, but at least 50% equity, at each individual director's discretion. *Id.* at ¶¶ 3, 43. Additionally, under the 2013 Compensation Policy, each director received a total of 50,000 RSUs in 2013, under the 2011 Plan, that would vest quarterly over the next three fiscal years (2013-2016). *Id.* at ¶ 3. In conformance with this policy, Advaxis' non-employee directors had already received their $100,000 salary, in equity and/or cash, for the 2015 fiscal year at the time that the 2015 Awards were issued. *Id.* at ¶ 3. Thus, the 2015 Awards were made in addition to the compensation that the non-executive directors had already received for 2015. *Id.* at ¶¶ 46-49.

Plaintiff alleges that Defendants conspired to approve the 2015 Plan and the 2015 Awards, on March 30, 2015, because Defendants had knowledge that certain information was about to be released to the public (the "April Disclosures") that would cause Advaxis' stock

---

[4] Not to be confused with an equity incentive plan, the 2013 Compensation Policy was a strategy adopted by the Board, which laid out the equity that would be issued to non-employee directors from the pool of shares governed by the 2011 Plan, as well as what cash compensation those directors would receive.

price to increase. *Id.* at ¶ 50. In this manner, Plaintiff alleges that Defendants "spring-loaded" the 2015 Awards by ensuring that they would be in-the-money almost immediately after issuance. *Id.* at ¶ 50. During the month of April 2015, "the Company's stock price increased over 75%, going from $13.44, the Company's closing price on March 30, 2015" and the strike price[5] given to the 2015 Awards, "to close at $23.61 on April 23, 2015." *Id.* at ¶ 5. Based on this increase, within a month of the issuance of the 2015 Awards, Plaintiff asserts that Defendants made a "paper profit of over $15.8 million." *Id.* at ¶ 5.

Plaintiff alleges that the April Disclosures were comprised of three public announcements of new information that caused the Advaxis stock price increase during April 2015. *Id.* at ¶ 50. First, on April 8, 2015, Advaxis announced that in cooperation with Merck, Advaxis had initiated its Phase 1/2 clinical trial to evaluate the combination of ADXS-PSA (Advaxis' product) and KEYTRUDA® (pembrolizumab) in patients with previously treated, metastatic castration-resistant prostate cancer. *Id.* at ¶ 51. On the heels of this news, Advaxis' stock price jumped from $15.39 per share to $18.10 per share. Id. at ¶ 52. Second, Aduro Biotech, Advaxis' competitor, commenced its initial public offering ("IPO") on April 15, 2015. *Id.* at ¶ 53. According to Plaintiff, Advaxis' stock price experienced a "halo effect" in anticipation of Aduro's IPO, and increased to $21.78 per share on April 14, 2015. Id. at ¶ 53. Third, on April 20 and 21, 2015, Advaxis announced positive results from its clinical study involving ADX-HER2 at the annual meeting of the American Association for Cancer Research ("AACR"). *Id.* at ¶ 54. In response to this news, between April 21 and April 23, the Advaxis stock price increased, peaking at $23.61 per share. *Id.* at ¶ 55.

---

[5] A "strike price" is "[t]he price for which a security will be bought or sold under an option contract if the option is exercised. — Also termed *striking price; exercise price; call price; put price.*" Blacks Law Dictionary (10th ed. 2014).

Although Plaintiff does not allege specific facts demonstrating that on March 30, 2015, Defendants had foreknowledge of the April Disclosures, Plaintiff asserts that such knowledge can be inferred because "[t]he only reasonable conclusion from the timing of the March 30 equity grant is that the Board purposefully awarded the equity to take advantage of a known [upcoming] jump in stock price." *Id.* at ¶ 57. Specifically, Plaintiff relies on the following allegations to suggest that the timing of the 2015 Awards was suspicious:

> (i) the equity grant deviated in timing and amount from the Compensation Committee's historical compensation practices;
> (ii) the non-executive directors had already received their compensation for the 2015 fiscal year from the $100,000 base salary and the vesting of the 50,000 RSUs;
> (iii) the Company did not have enough stock to grant the awards [under the 2011 Plan], so the Board had to provisionally adopt the [2015 Plan] and the Compensation Committee had to provisionally grant the awards, all subject to a stockholder vote, in order to award the equity before the jump in the Company's stock price;
> (iv) the Compensation Committee did not wait until after the stockholders actually approved the 2015 Plan before making the awards;
> (v) the Board and the Compensation Committee provided no explanation for why additional awards should be granted in light of the above; and
> (vi) the timing of the Company's release of good news and stock price jump immediately after the March 30 grant demonstrates the spring-loading.

*Id.* at ¶ 57. Based on these alleged facts, Plaintiff claims that the Board knowingly granted the 2015 Awards at a strike price below fair market value, because the market price of Advaxis stock at the end of the day on March 30, 2015 was below what the Board knew to be the true value of the stock. *Id.* at ¶ 62.

On April 7, 2015, the Board issued a Proxy Statement (the "2015 Proxy") seeking, among other things, stockholder approval of the 2015 Plan, as well as Director Defendants' continuing election to the Board. *Id.* at ¶ 4, 58. Under the 2015 Proxy, if stockholders voted against adopting the 2015 Plan, the 2015 Awards would not go into effect. *Id.* at ¶ 4. Likewise, if

Director Defendants were not re-elected to the Board, their portion of the 2015 Awards would not vest, and they would not reap their full value. *Id.* at ¶¶ 58, 69.

Plaintiff alleges that Director Defendants made two materially false and misleading statements in the 2015 Proxy, in an attempt to secure stockholder approval of the 2015 Plan and the 2015 Awards: (1) that the 2015 Plan promoted "[s]ound [c]orporate [g]ovenance [p]ractices" and was designed "to include a number of features that reinforce and promote alignment of equity compensation arrangements for employees, officers and non-employee directors with the interests of stockholders and the company," and (2) that stock options under the 2015 Plan "may not be granted with exercise prices lower than the fair market value of the underlying shares on the grant date." *Id.* at ¶¶ 4, 59. Plaintiff alleges that the first statement is materially false or misleading because the 2015 Plan did not promote sound governance, but rather "did the opposite, as spring-loading is a well-established breach of fiduciary duty and the antithesis of sound corporate governance." *Id.* at ¶ 63. As to the second statement, Plaintiff alleges that this was materially false or misleading because "[w]hile the stock options were technically granted at fair market value, the Compensation Committee and the rest of the Board knew that the Company was about to release positive news that would increase its stock price." *Id.* at ¶ 62. According to Plaintiff, Director Defendants should have disclosed to stockholders that "the Compensation Committee were engaged in the spring-loading of equity awards." *Id.* at ¶ 64. Additionally, Plaintiff alleges that "[b]y seeking re-election without disclosing the material facts that they were not abiding by the terms and spirit of either Advaxis' [sic] prior plan, the [2011 Plan] or the [2015 Plan], the members of the Board misled stockholders." *Id.* at ¶ 7.

At the annual stockholders' meeting on May 27, 2015 (the "2015 Meeting"), the Advaxis stockholders voted to approve the 2015 Plan and to re-elect each of the Director Defendants.

Certification of Craig Carpenito, Esq., in Supp. of Defs.' Mot. to Dismiss the Compl., or, in the Alternative, to Stay ("Carpenito Cert.") Ex. E (Advaxis Form 8-K dated May 27, 2015).[6] Because the 2015 Awards were issued by Committee Defendants contingent on subsequent stockholder approval of the 2015 Plan, the stockholders' vote in support of the 2015 Plan at the 2015 Meeting satisfied this condition and finalized the issuance of the 2015 Awards.

According to Plaintiff, as a result of their alleged spring-loading of the 2015 Awards, each of the Director Defendants has received an average of $683,616 in compensation for fiscal year 2015, not including the vesting of the previous 50,000 RSU award. Compl. ¶ 70. Plaintiff alleges that "[t]his amount is more than double the Board's salary for the previous year of $258,622 per director, on average." *Id.* at ¶ 71. Additionally, Plaintiff alleges that it is "more than the average amount that the Company's peers paid their directors, which was $245,751 in 2014." *Id.* at ¶ 71. Plaintiff asserts that "[a]s a result of the Individual Defendants' improprieties, Advaxis' reputation within the business community and in the capital markets is significant [sic] impaired." *Id.* at ¶ 72. Accordingly, Advaxis allegedly "stands to incur higher marginal costs of capital and debt because the misleading statements and wrongful actions by the [Defendants] have materially increased the perceived risks of investing in and lending money to the Company." *Id.* at ¶ 72. In addition, the alleged spring-loaded stock options purportedly "creat[e] a dilutive effect and decreas[e] the amount per share that the Company will be able to sell equity for in the future." *Id.* at ¶ 72. Furthermore, because the 2015 Awards were allegedly given a lower strike price than the fair market value at the time they were awarded, when the options are eventually exercised, Advaxis will receive less payment than it should from Defendants. *Id.* at

---

[6] As matters of public record, I may consider Advaxis' public filings with the SEC on this motion to dismiss. *See In re Rockefeller Ctr. Props. Sec. Litig.*, 311 F.3d 198, 292 (3d Cir. 2002).

¶ 73. Finally, Plaintiff alleges that "as a direct and proximate result of the [Defendants'] actions, Advaxis has expended, and will continue to expend, significant sums of money in the form of compensation and benefits paid to [Defendants] who have breached their duties to Advaxis." *Id.* at ¶ 74.

On August 20, 2015, Plaintiff filed the present Complaint on behalf of Advaxis, asserting the following claims: (1) violation of Section 14(a) of the Exchange Act by Director Defendants and (2) Delaware state law claims[7] of: (i) breach of fiduciary duty by all Defendants; (ii) corporate waste by all Defendants; and (iii) unjust enrichment by all Defendants. *Id.* at ¶¶ 85-103. Notably, Plaintiff's Complaint was filed one month after Timothy Larkin ("Delaware Plaintiff"), a purported Advaxis shareholder, filed a parallel action in the Delaware Court of Chancery (the "Delaware Action"), based on allegations substantially similar to those set forth in Plaintiff's Complaint. Carpenito Cert. Ex. A (Verified Stockholder Derivative and Class Action Complaint in *Larkin v. O'Connor, et al.*, Civ. No. 11338-CB (Del. Ch. July 27, 2015)).[8] Like Plaintiff here, Delaware Plaintiff asserts derivative claims on behalf of Advaxis and against Defendants for breach of fiduciary duty and unjust enrichment, arising from their alleged spring-loading of the 2015 Awards. *Id.* at ¶¶ 109-119. However, Delaware Plaintiff does not bring a corporate waste claim, and, in lieu of a Section 14(a) claim, he asserts a breach of duty of candor claim for failing to disclose material information in the 2015 Proxy. *Id.* at ¶¶ 120-124.

---

[7] Advaxis is a Delaware corporation. Compl. ¶ 16; *see also* Carpenito Cert. Ex. E. at 1. "In a case where state substantive law applies, we must apply the forum state's choice-of-law rules. Under New Jersey's choice-of-law rules, the law of the state of incorporation governs internal corporate affairs." *Fagin v. Gilmartin*, 432 F.3d 276, 282 (3d Cir. 2005) (citation omitted). Thus, Plaintiff's state law claims are governed by Delaware state law.

[8] As matters of public record, I may consider the filings made in the Delaware Action on this motion to dismiss. *See In re Rockefeller*, 311 F.3d at 292.

Defendants move to dismiss the Complaint, pursuant to Fed. R. Civ. P. 12(b)(6), for failure to state a claim. Alternatively, Defendants move to dismiss or stay Plaintiff's state law claims, pending the outcome of the Delaware Action, pursuant to the *Colorado River* abstention doctrine. Plaintiff opposes these motions.

## II.   Standard of Review

Under Rule 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When reviewing a motion to dismiss on the pleadings, courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quotations omitted). Under such a standard, the factual allegations set forth in a complaint "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Indeed, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[A] complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009).

However, Rule 12(b)(6) only requires a "short and plain statement of the claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. The complaint must include "enough factual matter (taken as true) to suggest the required element. This does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element."

*Phillips*, 515 F.3d at 234 (citation and quotations omitted); *Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 118 (3d Cir. 2013) ("[A] claimant does not have to set out in detail the facts upon which he bases his claim. The pleading standard is not akin to a probability requirement; to survive a motion to dismiss, a complaint merely has to state a plausible claim for relief." (citation and quotations omitted)).

In sum, under the current pleading regime, when a court considers a dismissal motion, three sequential steps must be taken: first, "it must take note of the elements the plaintiff must plead to state a claim." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quotations omitted). Next, the court "should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* (quotations omitted). Lastly, "when there are well-pleaded factual allegations, the court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* (quotations and brackets omitted).

"Independent of the standard applicable to Rule 12(b)(6) motions," Fed. R. Civ. P. 9(b) "imposes a heightened pleading requirement of factual particularity with respect to allegations of fraud." *In re Rockefeller*, 311 F.3d at 216; *see also* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."). This heightened standard has been rigorously applied to securities fraud cases, including cases involving claims under Section 14(a). *See In re Exxon Mobil Corp. Sec. Litig.*, 500 F.3d 189, 197 (3d Cir. 2007); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1417 (3d Cir. 1997). To satisfy this heightened pleading standard, a plaintiff must state the circumstances of his alleged cause of action with "sufficient particularity to place the defendant on notice of the 'precise

10

misconduct with which [it is] charged.'" *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) (quoting *Lum v. Bank of America*, 361 F.3d 217, 223-24 (3d Cir. 2004)). Specifically, the plaintiff must plead or allege the "date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Frederico*, 507 F.3d at 200 (citing *Lum*, 361 F.3d at 224). Indeed, the Third Circuit has advised that, at a minimum, Rule 9(b) requires a plaintiff to allege the "essential factual background that would accompany 'the first paragraph of any newspaper story'—that is, the 'who, what, when, where and how' of the events at issue." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276-77 (3d Cir. 2006) (quoting *In re Rockefeller*, 311 F.3d at 216).

In addition to Rule 9(b), plaintiffs alleging securities fraud pursuant to Section 14(a) of the Exchange Act must also comply with the heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C § 78u *et seq. Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 145 n. 9 (3d Cir. 2004). This heightened pleading standard is targeted at preventing abusive securities litigation. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) ("Private securities fraud actions . . . if not adequately contained, can be employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law."); *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 81 (2006) (identifying "ways in which the class-action device was being used to injure the entire U.S. economy" and listing examples such as "nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests, and manipulation by class action lawyers of the clients whom they purportedly represent . . .") (quotes and citations omitted).

The PSLRA provides two distinct pleading requirements, both of which must be met in order for a complaint to survive a motion to dismiss. *Institutional Investors Group v. Avaya, Inc.*,

564 F.3d 242, 252 (3d Cir. 2009). First, under 15 U.S.C. § 78u-4(b)(1), the complaint must "specify each allegedly misleading statement, why the statement was misleading, and, if an allegation is made on information and belief, all facts supporting that belief with particularity." *Winer Family Trust v. Queen*, 503 F.3d 319, 326 (3d Cir. 2007) (construing 15 U.S.C. § 78u-4(b)(1)). Second, the complaint must, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).[9]

Both provisions of the PSLRA require facts to be pled with "particularity." *Avaya*, 564 F.3d at 253. This particularity language "echoes precisely Fed. R. Civ. P. 9(b)." *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534 (3d Cir. 1999); *see also* Fed. R. Civ. P. 9(b) ("[A] party must state with particularity the circumstances constituting fraud or mistake."). Indeed, although the PSLRA replaces Rule 9(b) as the pleading standard governing private securities class actions,

---

[9] The PSLRA states, in pertinent part:

(b) Requirements for securities fraud actions
   (1) Misleading statements and omissions
   In any private action arising under this chapter in which the plaintiff alleges that the defendant-
      (A) made an untrue statement of a material fact; or
      (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading; the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.
   (2) Required state of mind
   In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C.A. § 78u-4(b)(1), (2).

12

the rule's particularity requirement "is comparable to and effectively subsumed by the requirements of [Section 78u-4(b)(1) of] the PSLRA." *Avaya*, 564 F.3d at 253 (citations omitted). This standard "requires plaintiffs to plead the who, what, when, where and how: the first paragraph of any newspaper story." *In re Advanta*, 180 F.3d at 534 (quotations marks omitted). If a complaint fails to comply with the specific pleading requirements of the PSLRA, dismissal of the complaint is statutorily mandated. 15 U.S.C. § 78u-4(b)(3)(A).

## III.  Analysis

### A.  Count I - Section 14(a) of the Exchange Act

Plaintiff brings a claim under Section 14(a) of the Exchange Act against Director Defendants for including allegedly false or misleading statements in the 2015 Proxy. Section 14(a) is designed "to prevent management or others from obtaining authorization for corporate actions by means of deceptive or inadequate disclosures in proxy solicitations." *Tracinda Corp. v. DaimlerChrysler AG*, 502 F.3d 212, 227-28 (3d Cir. 2007) (quoting *Seinfeld v. Becherer*, 461 F.3d 365, 369 (3d Cir. 2006)). Under Section 14(a), it is unlawful to solicit a proxy "in contravention of such rules and regulations as the [SEC] may prescribe as necessary and appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78n(a). Pursuant to Section 14(a), the SEC promulgated Rule 14a-9, which provides that no proxy statement shall contain

> any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

17 C.F.R. § 240.14a-9(a).

Although Section 14(a) does not explicitly provide for a right of private action, the Supreme Court has recognized an implied right of private action under Section 14(a), which allows shareholders to "sue for damages when a misrepresentation in a proxy statement interferes with 'fair corporate suffrage.'" *Tracinda*, 502 F.3d 212 at 228 (quoting *J. I. Case Co. v. Borak*, 377 U.S. 426, 431 (1964)). "To prevail on a Section 14(a) claim, a plaintiff must show that '(1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction.'" *Tracinda*, 502 F.3d 212 at 228 (quoting *Chubb*, 394 F.3d at 144). Unlike claims for securities fraud brought under other sections of the Exchange Act, to state a claim under Section 14(a), a plaintiff need not allege scienter or culpable intent. *In re Exxon Mobil*, 500 F.3d at 196. Instead, "[f]or liability to attach under § 14(a), all that is required is that a proxy statement be 'false or misleading with respect to any material fact.'" *Id.* at 196-97. (quoting 17 C.F.R. § 240.14a-9(a)).

"To be actionable under Rule 14a-9, 'a statement or omission must have been misleading at the time it was made; liability cannot be imposed on the basis of subsequent events.'" *Tracinda*, 502 F.3d 212 at 228 (quoting *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002)). Information is material "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote," and there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (quoting *TSC Indus. v. Northway*, 426 U.S. 438, 440, 449 (1976)); *see also Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000). Because materiality is a mixed question of law and fact, "[o]nly if the alleged misrepresentations or omissions are so

14

obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality is it appropriate for the district court to rule that the allegations are inactionable as a matter of law." *Shapiro v. UJB Financial Corp.*, 964 F.2d 272, 280 n. 11 (3d Cir. 1992) (citation omitted). The Third Circuit has warned that the task of determining materiality can be especially difficult when the statement at issue contains "soft" information, i.e. statements of subjective analysis or extrapolation, such as opinions, motives, and intentions, or forward looking statements, like projections, estimates, and forecasts. *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 642 (3d Cir. 1989).

However, regardless of whether a piece of information is material, Rule 14a-9 does not create an affirmative duty to disclose any and all material information. *See* 17 C.F.R. § 240.14a-9(a); *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (applying similar language under Section 10(b) of the Exchange Act). Disclosure is only required under Rule 14a-9 when necessary to render "not false or misleading" any statement "which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact" or "to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading." 17 C.F.R. § 240.14a-9(a); *see also Matrixx*, 563 U.S. at 44; *Burlington*, 114 F.3d at 1432 (3d Cir. 1997) ("[P]ossession of material nonpublic information alone does not create a duty to disclose it."). Moreover, those Section 14(a) claims that involve "the undisclosed intent and 'unclean heart of a director, must also be accompanied by objective and external evidence of actual misrepresentation" to be actionable. *Tracinda*, 502 F.3d 212 at 228 (citing *Lewis v. Chrysler Corp.*, 949 F.2d 644, 651 (3d Cir. 1991)); *see also Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1095-96, (1991) (holding that Section 14(a) liability may not be

15

established on "mere disbelief or undisclosed motive without any demonstration that the proxy statement was false or misleading.").

Here, Plaintiff alleges that the 2015 Proxy contained material misstatements that misled shareholders to approve the 2015 Awards passed by the Compensation Committee. In that regard, Plaintiff claims that "the Complaint alleges stockholders were misled as to objective facts that can be proved false through direct or circumstantial evidence at the time the proxy was published," and therefore, he argues that he may bring a claim against Director Defendants for failing to disclose their bad intent. Pl.'s Mem. of P. & A. in Opp'n to Defs.' Mot. to Dismiss the Verified Stockholder Derivative Compl. or in the Alternative, to Stay ("Pl.'s Opp'n Br. ") 21. In particular, the 2015 Proxy stated that the 2015 Plan promotes "[s]ound [c]orporate [g]overnance [p]ractices" and is designed "to include a number of features that reinforce and promote alignment of equity compensation arrangements for employees, officers and non-employee directors with the interests of stockholders and the company." Compl. ¶¶ 4, 59. Plaintiff asserts this statement is materially false or misleading because the 2015 Plan did not promote sound corporate governance, but rather "did the opposite, as spring-loading is a well-established breach of fiduciary duty and the antithesis of sound corporate governance." *Id.* at ¶ 63. Similarly, Plaintiff asserts that the claim in the 2015 Proxy that under the 2015 Plan, stock options "may not be granted with exercise prices lower than the fair market value of the underlying shares on the grant date," was materially false or misleading because "[w]hile the stock options were technically granted at fair market value, the Compensation Committee and the rest of the Board knew that the Company was about to release positive news that would increase its stock price." *Id.* at ¶¶ 4, 59, 62. Plaintiff contends that Director Defendants violated Section 14(a) by

16

materially omitting from these statements the fact that "the Compensation Committee were engaged in the spring-loading of equity awards." *Id.* at ¶ 64.

In response, Defendants argue that Plaintiff has failed to allege that the 2015 Proxy contained any material misstatement or omission, because the statements at issue are not objectively false or misleading, but rather are rendered false or misleading solely on the basis of Director Defendants' failure to disclose their alleged spring-loading scheme. Defendants posit that such disclosures are not required under Section 14(a).

It is well-established that corporate officers and directors do not violate federal securities law by failing to disclose a bad motive or scheme underlying their actions. *Lewis*, 949 F.2d at 651. By itself "the unclean heart of a director is not actionable, whether or not it is disclosed, unless the impurities are translated into actionable deeds or omissions both objective and external." *Id.* As the Third Circuit has explained:

> [T]he general rule is that the federal securities laws do not impose a duty upon parties to publicly admit the culpability of their actions. First, in the absence of such a rule, parties would be placed in the untenable position of either publicly confessing their potential misconduct before their guilt is properly determined by a court, or incurring liability for damages resulting from their failure to disclose the misconduct. Second, absent such a rule, instances of misconduct which do not constitute securities fraud but which constitute violations of state law, would, nevertheless, often give rise to a [securities fraud claim] for failure to disclose the misconduct. As a result, the state law claim would effectively be boot-strapped into a [securities fraud claim] and brought into the federal courts for resolution, circumventing . . . federalism considerations. . . . Third, the rule does not significantly impede the flow of material information to investors. The rule limits only the duty to publicly admit to misconduct; it does not limit a party's duty to disclose all material facts relating to the party's actions, including those that might relate to misconduct. Accordingly, [a plaintiff], may not bootstrap a state law claim into a federal case by alleging that the disclosure philosophy of the statute obligates defendants to reveal either the culpability of their activities, or their impure motives for entering the allegedly improper transaction.

*Id.* at 652 (citations, quotations, and brackets omitted).

Based on these principles, Director Defendants are not required by Section 14(a) to disclose their alleged spring-loading scheme, because such a disclosure is, at its core, a disclosure of Director Defendants' unclean hearts. Plaintiff cannot claim that Director Defendants' failure to disclose their alleged spring-loading scheme amounts to a failure to disclose the objective and external facts of the 2015 Awards in the 2015 Proxy. Indeed, the relevant details of the 2015 Awards (timing, amount, strike price, and recipients) were disclosed in the proxy. Carpenito Cert. Ex. B at 11. Moreover, the April Disclosures were public knowledge by the date of the 2015 Meeting. Thus, the only aspect of the alleged spring-loading scheme that Director Defendants allegedly failed to disclose to the Advaxis shareholders in the 2015 Proxy, was that the 2015 Awards were issued with the intent to spring-load. Consequently, because a failure to disclose bad intent, by itself, is not actionable, Director Defendants' failure to disclose this aspect of their alleged spring-loading scheme cannot form the basis of a Section 14(a) claim.

Additionally, under the facts alleged by Plaintiff, none of the statements at issue are false or misleading absent Director Defendants' alleged bad intent. Indeed, Plaintiff does not allege facts objectively demonstrating that the 2015 Awards were not issued at a fair market value. To the contrary, Plaintiff concedes that the 2015 Awards were "technically granted at fair market value" -- Advaxis' closing price on March 30, 2016, the day they were granted. Compl. ¶¶ 5, 46, 62. Rather, the theory of Plaintiff's claim in this regard, is that this price was not the actual fair market value of the awards at that time, because Director Defendants knew that the stock was undervalued. *Id.* at ¶ 62. However, this is not a proper basis for a Section 14(a) claim, because the truth of this statement is based solely on the alleged bad intent of Director Defendants in approving the 2015 Plan and issuing the 2015 Awards. If Director Defendants granted the

awards with the intent to spring-load them, then, under the facts alleged, they were not granted at fair market value. Conversely, if Director Defendants issued the 2015 Awards absent any ill-intent, then, under the facts alleged, they were issued at fair market value. Thus, this statement is misleading solely on the basis of Director Defendants' bad intent, not any objective or external facts. Because Section 14(a) does not require directors to disclose their impure motives, Plaintiff cannot state a Section 14(a) claim based on alleged misstatements arising from a failure to disclose such information.

Furthermore, the statements in the 2015 Proxy regarding the design and purpose of the 2015 Plan cannot form the basis of a Section 14(a) claim. Plaintiff does not, for example, argue that the terms of the 2015 Plan itself objectively run counter to Advaxis' interest in sound corporate governance. Instead, Plaintiff essentially argues that Director Defendants' claims that the 2015 Plan was designed to promote sound corporate governance were false or misleading because Director Defendants intended to circumvent the plan in an act of bad corporate governance. However, without allegations that these statements were false independent of Director Defendants' bad intent, Plaintiff fails to state a Section 14(a) claim. *See Werner v. Werner,* 267 F.3d 288, 298 (3d Cir. 2001) (management statement that restricted stock plan benefited "key employees" and "key executives," does not create a duty to disclose that plan only benefited defendant managers, allegedly in breach of their fiduciary duties); *Lewis*, 949 F.2d at 652 (rejecting argument that if the company affirmatively portrayed a transaction as "being in the shareholders' best interests," the company become obligated to reveal that the transaction would actually facilitate the management's entrenchment interests); *Biesenbach v. Guenther*, 588 F.2d 400, 402 (3d Cir. 1978) (management statement that transaction was in shareholders' interest when allegedly it was not, does not support securities fraud claim).

19

In sum, as a matter of law, Plaintiff's allegations that Director Defendants failed to disclose their alleged scheme to spring-load the 2015 Awards is not actionable, in and of itself, under Section 14(a).[10] *See Lewis*, 949 F.2d at 651. Plaintiff's Section 14(a) claim is a bald attempt to bootstrap his state law breach of fiduciary duty, corporate waste, and unjust enrichment claims into a federal case, and therefore, it is dismissed without prejudice for failure to state a claim.

### B. *Colorado River* Abstention

Defendants argue that the Court should abstain from hearing Plaintiff's remaining state law claims, pursuant to the *Colorado River* abstention doctrine. Under this doctrine, in certain extremely limited circumstances, a federal court may defer to pending state court proceedings, based on considerations of "wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation." *Ryan v. Johnson*, 115 F.3d 193, 195 (3d Cir. 1997) (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)). However, "an abstention, even for considerations of wise judicial administration . . . can be justified . . . only in the exceptional circumstances where the order to the parties to repair to the state court would clearly serve an important countervailing interest." *Spring City Corp. v. Am. Bldgs. Co.*, 193 F.3d 165, 173 (3d Cir. 1999) (quotations omitted). In the present matter, there are no such "exceptional circumstances" that would warrant abstention under *Colorado River*.

---

[10] The Court notes that Plaintiff has not asserted a breach of the fiduciary duty of candor claim under Delaware law against Director Defendants for the alleged material misstatements and omissions in the 2015 Proxy. Thus, I make no finding here, as to whether the facts alleged could form the basis for such a claim.

Determining whether abstention is appropriate is a two-part inquiry. *Ryan*, 115 F.3d at 196. First, as a threshold matter, the district court must determine whether the concurrent state and federal actions are parallel. *Id*. In general, cases are parallel when they involve the same parties and claims. *See Rodin Properties-Shore Mall, N.V. v. Cushman & Wakefield, Inc.*, 49 F. Supp. 2d 709, 718 (D.N.J. 1999). However, the parties and claims need not be completely identical for state and federal cases to be considered parallel; rather, parallel litigation is normally found when the identity of the parties and claims are substantially similar. *IFC Interconsult, AG v. Safeguard Int'l Partners*, LLC, 438 F.3d 298, 306 (3d Cir. 2006). If the cases are not parallel, the district court lacks the power to abstain. *Ryan*, 115 F.3d at 196.

Here, Plaintiff does not dispute that upon dismissal of his Section 14(a) claim, the Delaware Action and the present action would become parallel proceedings. *See* Pl.'s Opp'n Br. 48-50.[11] Indeed, both actions raise substantially similar claims, based on the same underlying events and conduct -- the alleged spring-loading of the 2015 Awards and the alleged misrepresentations made in the 2015 Proxy. Carpenito Cert. Ex. A at ¶¶ 31-44, 47-49, 67-69. Additionally, both actions involve derivative breach of fiduciary duty and unjust enrichment claims. *Id.* at ¶¶ 1-9, 79-93, 109-119. And, although only the present action asserts a corporate waste claim, this claim overlaps sufficiently with the breach of fiduciary duty and unjust enrichment claims in the Delaware Action, that the resolution of the latter two claims will fully address the former.[12] *See IFC*, 438 F.3d at 306 ("Parallel cases involve . . . 'substantially

_____

[11] Plaintiff primarily argues that *Colorado River* abstention is inappropriate, because his Section 14(a) claim is exclusively within the jurisdiction of the federal courts. Pl.'s Opp'n Br. 48-50. However, this argument is rendered moot by the Court's dismissal of the Section 14(a) claim.

[12] The fact that Delaware Plaintiff also separately asserts a breach of duty of candor claim, Carpenito Cert. Ex. A at ¶¶ 120-124, is not relevant to the application of *Colorado River* here,

identical' claims, raising 'nearly identical allegations and issues.'"). As to the parties, the defendants in both actions are identical. Carpenito Cert. Ex. A. And, even though the plaintiffs in both actions are different individuals, they are sufficiently identical for the purposes of *Colorado River* abstention, because they are both Advaxis shareholders bringing derivative claims on behalf of Advaxis. *See Clark v. Lacy,* 376 F.3d 682, 686 (7th Cir. 2004) (finding that the parties in derivative suits with different stockholder plaintiffs, which were brought on behalf of the same company, are "substantially the same for *Colorado River* purposes," because the company "is the true party in interest in both cases"); *cf. Cramer v. Gen. Tel. & Elecs. Corp.*, 582 F.2d 259, 267 (3d Cir. 1978) (finding that because the substantive claim in a shareholder derivative action belongs to the corporation, *res judicata* bars a shareholder from bringing claims on behalf of the corporation, which have already been litigated by a different shareholder). Accordingly, the present action and the Delaware Action are parallel for the purposes of the *Colorado River* abstention doctrine.

Once a district court determines that the federal and state court actions are parallel, it moves on to the second step of the *Colorado River* analysis, which considers the following factors "(1) in an *in rem* case, which court first assumed jurisdiction over the property; (2) the inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation; (4) the order in which jurisdiction was obtained; (5) whether federal or state law controls; and (6) whether the state court will adequately protect the interests of the parties." *Nationwide Mut. Fire Ins. Co. v. George V. Hamilton, Inc.,* 571 F.3d 299, 308 (3d Cir. 2009) (brackets omitted). No

---

because the resolution of the breach of duty of candor claim will not prevent the resolution of any of Plaintiff's state law claims in the present action.

one factor in the *Colorado River* analysis is determinative, and "only the clearest of justifications will warrant dismissal." *Ryan*, 115 F.3d at 196 (quoting *Colorado River*, 424 U.S. at 818-19).

As to the first and second factors, the parties agree that there is no property at issue over which either court might assume *in rem* jurisdiction and both forums are equally convenient. Defs.' Br. in Supp. of Mot. to Dismiss the Compl. or, in the Alternative, to Stay ("Defs.' Supp. Br.") at 24; Pl.'s Opp'n Br. at 50 n 48. Thus, the first two factors are neutral as to whether *Colorado River* abstention should apply. *See BIL Mgmt. Corp. v. N.J. Econ. Dev. Auth.*, 310 F. App'x 490, 492 (3d Cir. 2008).

Regarding the third factor, although allowing both the present action and the state action to proceed in parallel actions runs counter to the "conservation of judicial resources," *see Colorado River*, 424 U.S. at 817, Defendants identify no "strongly articulated congressional policy against piecemeal litigation in the specific context" of this case, *see Ryan*, 115 F.3d at 198. In applying the *Colorado River* abstention doctrine, the Third Circuit has explained that standing alone, "the mere possibility of piecemeal litigation" cannot justify the application of *Colorado River* abstention. *Ryan*, 115 F.3d at 198. Rather, this factor only supports abstention where there is "a strongly articulated congressional policy against piecemeal litigation in the specific context of the case under review." *Id.* ("The presence of garden-variety state law issues has not, in this circuit, been considered sufficient evidence of a congressional policy to consolidate multiple lawsuits for unified resolution in the state courts."). "Indeed, if the mere possibility of concurrent state-federal litigation satisfies *Colorado River's* 'piecemeal adjudication' test, the test becomes so broad that it swallows-up the century-old principle . . . that 'the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction . . . .'" *Id.* (quoting *Colorado River*, 424 U.S. at 817).

23

Here, Defendants do not identify any congressional policy, beyond a generalized interest in avoiding piecemeal litigation, that would specifically weigh in favor of abstaining from the present action. Defendants cite to the Seventh Circuit's opinion in *Clark v. Lacy* to support their contention that "the possibility of judicial redundancy and the danger of inconsistent results favored staying the federal case." Defs.' Supp. Br. at 25 (citing *Clark*, 376 F.3d at 687). However, Defendants' reliance on *Clark* is misplaced, because the Third Circuit clearly construes this factor of the *Colorado River* analysis more narrowly than the Seventh Circuit. *Compare Clark*, 376 F.3d at 687 ("Our Court has held that this sort of redundancy counsels in favor of a stay.") *with Spring City*, 193 F.3d at 172 ("[E]ven though it is important to prevent piecemeal litigation, a stay is appropriate only when there is a strong federal policy against such litigation.") (quotations and brackets omitted). Likewise, Defendants' citation to *Sheldrick v. Wells Fargo Bank, N.A.*, Civ. No. 15-5332, 2015 U.S. Dist. LEXIS 115064 (D.N.J. Aug. 31, 2015) and *Ruffolo v. HSBC Bank USA, N.A.*, Civ. No. 14-638 (MAS) (DEA), 2014 U.S. Dist. LEXIS 141514 (D.N.J. Oct. 3, 2014), is inapposite, because both of these cases involved a strongly articulated congressional policy in favor of abstention, unrelated to Plaintiff's claims in the present action. *See Sheldrick*, 2015 U.S. Dist. LEXIS 115064, at *10; *Ruffolo*, 2014 U.S. Dist. LEXIS 141514, at *11; *St. Clair v. Wertzberger*, 637 F. Supp. 2d 251, 255 (D.N.J. 2009). Specifically, both cases involved bank foreclosure actions, which implicated the federal congressional policy, articulated under the Anti-Injunction Act, 28 U.S.C. § 2283, that prohibits federal courts from granting injunctions to stay proceedings in a state court.[13] *See St. Clair*, 637

---

[13] Abstention was appropriate in *Ruffolo* and *Sheldrick*, because if the federal court were to find that the defendant banks improperly instituted a state foreclosure action, "[i]t would also effectively constitute an injunction enjoining the state court from ordering a foreclosure sale,

24

F. Supp. 2d at 255. Because Defendants do not argue that any strongly articulated congressional policy militates for abstention in the specific context of the present action, this factor does not support abstention.

The fourth *Colorado River* factor is not "measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 21 (1983). In that connection, this factor weighs in favor of abstention, because more progress has been made in the Delaware action than in the present action. Indeed, not only was the Delaware Action initiated nearly a month before the present action, in addition, the Honorable Andre G. Bouchard has already rendered a partial ruling on Defendants' motion to dismiss Delaware Plaintiff's claims -- denying the motion as to the breach of fiduciary duty and unjust enrichment claims against Committee Defendants. Letter from Mitchell Ayes, Esq. Ex. 1 (Tr. of Hr'g on Defs.' Mot. to Dismiss and the Ct.'s Partial Ruling) ("Del. Hr'g Tr.") (Dkt. No. 48). However, although this factor weighs in favor of applying *Colorado River* abstention, the superior progression of the state court proceedings, by itself, does not constitute sufficient "exceptional circumstances" to justify abstention. *McMurray v. De Vink*, 27 F. App'x 88, 93 (3d Cir. 2002); *see also Ryan*, 115 F.3d 193, 196 (3d Cir. 1997) ("no one factor is determinative").

As to the fifth factor, because I have dismissed Plaintiff's Section 14(a) claim, Delaware law controls all remaining claims in the present action. The Supreme Court has made clear that "while the presence of federal issues militates against abstention, the converse cannot be said; abstention cannot be justified merely because a case arises entirely under state law." *Ryan*, 115

---

which is prohibited by the Anti-Injunction Act." *Id.*; *see also Sheldrick*, 2015 U.S. Dist. LEXIS 115064, at *10; *Ruffolo*, 2014 U.S. Dist. LEXIS 141514, at *11.

F.3d at 199 (citing *Cone*, 460 U.S. at 26). However, "in some rare circumstances, state law issues could weigh in favor of the federal court's surrender of jurisdiction." *Ryan*, 115 F.3d at 199 (quoting *Cone*, 460 U.S. at 26) (quotations and brackets omitted). Here, Defendants argue that because the Delaware Court of Chancery has unique expertise in applying Delaware corporate law, "[t]he important issues of Delaware corporate law in both actions should be decided by that state's courts." Defs.' Supp. Br. at 27. However, although the Court "share[s] [Defendants'] high regard for the courts and jurists of Delaware, and [I am] well aware of the unique stature of corporate law in Delaware . . . that is not a sufficient reason for a federal court to refrain from exercising its jurisdiction." *McMurray*, 27 F. App'x at 93.

Finally, regarding the sixth factor, Plaintiff does not attempt to argue that the Delaware Court of Chancery will be unable to adequately protect his interests. *See* Pl.'s Opp'n Br. at 50 n 48. However, "this factor is normally relevant only when the state forum is inadequate." *Ryan*, 115 F.3d at 200. Thus, when the state court is adequate, "given the heavy presumption the Supreme Court has enunciated in favor of exercising federal jurisdiction . . . this factor carries little weight." *Id.*

In conclusion, the balance of the *Colorado River* factors does not weigh in favor of abstention. Thus, Defendants have failed to overcome the strong presumption to exercise jurisdiction over this case. Accordingly, Defendants' motion to dismiss or stay pursuant to *Colorado River* is denied.

### C.  Count II - Breach of Fiduciary Duty

Plaintiff alleges that Defendants breached their fiduciary duties of loyalty and good faith to Advaxis "by creating a culture of lawlessness within Advaxis, and/or consciously failing to prevent the Company from engaging in the unlawful acts" and "by awarding and/or receiving

26

excessive and improper compensation at the expense of the Company." Compl. ¶¶ 32, 91-92. Under Delaware law, directors and officers of a corporation owe certain fiduciary duties to the corporation and its shareholders. *Weinberger v. Uop*, 457 A.2d 701, 710 (Del. 1983). According to the Delaware Supreme Court:

> A public policy, existing through the years, and derived from a profound knowledge of human characteristics and motives, has established a rule that demands of a corporate officer or director, peremptorily and inexorably, the most scrupulous observance of his duty, not only affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation, or to deprive it of profit or advantage which his skill and ability might properly bring to it, or to enable it to make in the reasonable and lawful exercise of its powers. The rule that requires an undivided and unselfish loyalty to the corporation demands that there shall be no conflict between duty and self-interest.

*Id.* (quoting *Guth v. Loft, Inc*., 5 A.2d 503, 510 (Del. 1939)).

If a director or officer of a Delaware corporation is alleged to have breached his fiduciary duty to the corporation by engaging in an unfair self-dealing transaction -- such as awarding himself excessive compensation -- he has the burden of "showing that the compensation arrangements are fair to the corporation." *Telxon Corp. v. Meyerson*, 802 A.2d 257, 265 (Del. 2002). "The requirement of fairness is unflinching in its demand that where one stands on both sides of a transaction, he has the burden of establishing its entire fairness, sufficient to pass the test of careful scrutiny by the courts." *Weinberger*, 457 A.2d at 710. Because the entire fairness standard puts the burden of proof on the defendant director or officer, if the standard applies, it "normally will preclude dismissal of a complaint on a Rule 12(b)(6) motion to dismiss." *Calma v. Templeton*, 114 A.3d 563, 589 (Del. Ch. 2015) (quoting *Orman v. Cullman*, 794 A.2d 5, 20 n. 36 (Del. Ch. 2002)). "But, even in a self-interested transaction in order to state a claim a

shareholder must allege some facts that tend to show that the transaction was not fair." *Calma*, 114 A.3d at 589 (quotations and brackets omitted).

Conversely, if "an independent compensation committee" is employed to award salaries and bonuses to the corporation's other directors and officers, the transaction is not self-interested, and it is subject to the business judgment presumption, instead of the entire fairness standard. *Valeant Pharms. Int'l v. Jerney*, 921 A.2d 732, 745-46 (Del. Ch. 2007). The business judgment standard involves a lower level of judicial scrutiny than entire fairness, and examines whether "no person of ordinary sound business judgment would say that the consideration received [by the corporation] for the options was a fair exchange for the options granted." *Michelson v. Duncan*, 407 A.2d 211, 224 (Del. 1979).

Here, Plaintiff contends that the issuance of the 2015 Awards was a self-interested transaction to which the entire fairness standard applies. However, under the facts alleged, not all Defendants stand on both sides of the transaction. Rather, only Committee Defendants, those Director Defendants who sat on the Compensation Committee and actually issued the 2015 Awards, both determined the magnitude of the awards and enjoyed their benefits. Thus, because Committee Defendants allegedly stood on both sides of the transaction when they approved the 2015 Awards, their decision may be subject to the entire fairness standard. Conversely, it cannot be said that those Director Defendants and Officer Defendants (collectively, "Recipient Defendants") who were not on the Compensation Committee, had any conflict because they only accepted the 2015 Awards -- they did not vote to approve or issue them. Thus, since under the facts alleged, Recipient Defendants did not "self-determine" their own compensation, they did not stand on both sides of the transaction, and therefore, their decision to accept the 2015 Awards falls within the business judgment presumption. *See Telxon*, 802 A.2d at 265.

Nonetheless, Defendants argue that the business judgment standard should be applied not only to Recipient Defendants' alleged actions, but also to Committee Defendants' alleged actions. Specifically, Defendants argue that the business judgement rule applies to Committee Defendants' decision to issue the 2015 Awards, because the Advaxis shareholders ratified the 2015 Awards in the 2015 Meeting. Indeed, under Delaware law, the business judgment rule protects any issuance of director and officer equity grants that has been ratified by the corporation's stockholders. *Michelson*, 407 A.2d at 225. Thus, if Defendants can demonstrate that the Advaxis stockholders ratified the issuance of the 2015 Awards by the Compensation Committee, "the burden of proof is shifted to [Plaintiff] . . . [to] convince the court that no person of ordinarily sound business judgment would be expected to entertain the view that the consideration furnished by [Committee Defendants] is a fair exchange for the options conferred." *Calma*, 114 A.3d at 580 (quoting *Gottlieb v. Heyden Chem. Corp.*, 91 A.2d 57, 58 (Del. 1952)).

Ratification occurs when a majority of uncoerced, fully informed, and disinterested stockholders specifically approve a corporate action. *Calma*, 114 A.3d at 586. Importantly, "the only director action or conduct that can be ratified is that which the shareholders are specifically asked to approve." *Gantler v. Stephens*, 965 A.2d 695, 713 (Del. 2009). Here, the parties dispute whether the Advaxis stockholders specifically approved the issuance of the 2015 Awards at the 2015 Meeting.

The 2015 Proxy set out the details of the 2015 Plan, including the limits placed on the issuance of awards under the plan. Carpenito Cert. Ex. B (2015 Proxy) at 8.[14] It also disclosed

---

[14] These limits include an overall cap of 3.6 million shares that may be issued under the plan, an upper bound on the stock awards that may be given to an individual officer in a calendar year (1 million shares of time-vesting options, time-vesting stock appreciation rights, or performance-vesting awards; $10 million in cash or property for performance-vesting awards; and 200,000

and summarized the 2015 Awards, including a table showing the exact amount of equity awards each Defendant received as part of the 2015 Awards, the date they were awarded, and the strike price at which they were issued. Carpenito Cert. Ex. B at 11. Additionally, the 2015 Proxy informed stockholders that if they voted to approve the 2015 Plan, the 2015 Awards would "be effective" and would "remain outstanding pursuant to their terms," but if they did not vote to approve the 2015 Plan, the 2015 Awards would be "cancelled and forfeited." Carpenito Cert. Ex. B at 11. Importantly, the 2015 Proxy did not specifically ask Advaxis stockholders to vote to approve the 2015 Awards. Carpenito Cert. Ex. B at iii. Instead, the Advaxis stockholders were only asked to vote for "approval of [the] Advaxis, Inc. 2015 Incentive Plan." Carpenito Cert. Ex. B at 6.

Plaintiff contends that because the stockholders were only asked to approve the 2015 Plan, and were not separately asked to approve the 2015 Awards, the stockholders did not ratify the issuance of the awards. Conversely, Defendants argue that because the 2015 Proxy disclosed the details of the 2015 Awards, and specified that the issuance of the 2015 Awards was contingent on the stockholders' approval of the 2015 Plan, the Advaxis stockholders' ratification of the 2015 Plan also constituted a ratification of the 2015 Awards. Defendants also argue that because the 2015 Plan set "meaningful limits" on the Compensation Committee's discretion to issue equity grants, the stockholders' approval of the 2015 Plan was a *de facto* approval of the 2015 Awards.

Defendants rely primarily on *Steiner v. Meyerson*, Civ. No. 13139, 1995 Del. Ch. LEXIS 95 (Del. Ch. July 19, 1995), to support their position. In *Steiner*, a stockholder of a Delaware

---

shares to any non-employee director), minimum vesting requirements, and an exercise price that is equal to or greater than the fair market value of a common share as of the grant date. Carpenito Cert. Ex. B at 8.

corporation attacked, as a breach of fiduciary duty, various compensation decisions made pursuant to the corporation's stockholder-approved outside director stock option plan. *Steiner*, 1995 Del. Ch. LEXIS 95, at *6. The plan at issue was "in effect, self-executing," because "it set forth the specific awards to be granted to the company's non-employee directors upon election to the board and annually thereafter." *Calma*, 114 A.3d at 581. The *Steiner* court concluded that an upfront stockholder vote in favor of the plan ratified the subsequent awards made pursuant to the plan, because "stockholder approval of the plan *per force* meant stockholder approval of the option awards." *Id*.

Defendants argue that *Steiner* is comparable to the facts here, because the stockholders in *Steiner* approved specific compensation awards, while simultaneously approving the compensation plan. However, *Steiner* is distinguishable from the present action, because the options at issue in *Steiner* were granted under a set schedule, dictated by the terms of the compensation plan. Thus, in *Steiner*, there was no ambiguity that when the stockholders voted to approve the compensation plan, they also approved the awards schedule that was part of the plan. Conversely, here, the 2015 Plan did not inherently prescribe the issuance of the 2015 Awards. Thus, because the Advaxis stockholders were only specifically asked to approve the 2015 Plan, and were not separately asked to approve the 2015 Awards, it is ambiguous whether the stockholders that ratified the adoption of the 2015 Plan also intended to ratify the 2015 Awards.

Importantly, under Delaware law, "the only director action or conduct that can be ratified is that which the shareholders are *specifically* asked to approve." *Gantler*, 965 A.2d at 713. Thus, for example, a stockholder vote in favor of a merger, will not ratify the board's approval of specific deal protection provisions that are part of the merger agreement, "because, in that case, the stockholders did not 'specifically vote in favor' of those defensive measures." *Calma*, 114

31

A.3d at 586 (quoting *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 68 (Del. 1995)). As Chancellor Bouchard explained in the Delaware Action:

> for a ratification defense to be effective, there must be ratification of a specific decision. And what underlies that is the notion that there has to be a meeting of the minds, if you will, about what's actually being approved between, on the one hand, the company, in this case, the compensation committee acting on behalf of the company, in terms of what it's doing, and, on the other hand, the stockholders who were asked to vote on something. There's got to be sufficient specificity so there is not ambiguity that they're agreeing to the same thing . . . .

Del. Hr'g Tr. at 69-70. Ultimately, Chancellor Bouchard concluded that based on the record before him, there was ambiguity as to whether the Advaxis stockholders intended to approve the 2015 Awards when they voted to approve the 2015 Plan. *Id.* at 71-72. This Court finds Chancellor Bouchard's analysis in this matter persuasive. Here, the issuance of the 2015 Awards and the approval of the 2015 Plan were two separate corporate actions, that, given the opportunity, the Advaxis stockholders could have independently approved or denied. Therefore, I cannot find on this motion to dismiss that the Advaxis stockholders voted to ratify the 2015 Awards at the 2015 Meeting.

Alternatively, Defendants argue that because the 2015 Plan set "meaningful limits" on the Compensation Committee's discretion to issue equity grants, the stockholders' approval of the 2015 Plan was a *de facto* approval of the 2015 Awards. Delaware Courts have found that shareholder ratification of an equity incentive plan can also constitute ratification of equity awards made pursuant to that plan, if the plan places "meaningful limits" on the discretion of the board of directors to issue itself such awards. *Calma*, 114 A.3d at 585; *Seinfeld v. Slager*, Civ. No. 6462-VCG, 2012 Del. Ch. LEXIS 139, at *40 (Del. Ch. June 29, 2012). This principle is an extension of the logic applied in *Steiner*, in that it conceives of a continuum of stockholder-approved equity incentive plans -- at one end of the spectrum, plans like that at issue in *Steiner*

prescribe exactly which equity awards are to be made pursuant to the plan, and at the other end

of the spectrum, plans give boards a blank check to issue equity awards at their own discretion.

*See Slager, 2012 Del. Ch. LEXIS 139, at \*40.* As the *Slager* court observed:

> [t]he sufficiency of definition that anoints a stockholder-approved option or bonus
> plan with business judgment rule protection exists on a continuum. . . . [T]here
> must be some *meaningful* limit imposed by the stockholders on the Board for the
> plan to . . . receive the blessing of the business judgment rule. . . . A stockholder-
> approved *carte blanche* to the directors is insufficient. The more definite a plan,
> the more likely that a board's compensation decision will be labeled disinterested
> and qualify for protection under the business judgment rule.

*Id.*

Importantly, however, in order for an equity grant to receive the benefit of this *de facto*

ratification, those equity grants must be made pursuant to the limitations set forth in the

shareholder-approved equity incentive plan. *See id.; Calma*, 114 A.3d at 582; *In re 3COM Corp.*

*Shareholders Litig.*, Civ. No. 16721, 1999 Del. Ch. LEXIS 215, at \*8 (Ch. Oct. 25, 1999). Here,

Plaintiff alleges that the 2015 Awards were not issued pursuant to the limitations outlined in the

2015 Plan. Specifically, Plaintiff alleges that although the 2015 Plan specified that all equity

grants were to be issued at fair market value or greater, nonetheless, in contravention of this

limitation, the 2015 Awards were issued at a price lower than fair market value, because

Committee Defendants knew the stock on that date was undervalued, based on the upcoming

April Disclosures. Compl. ¶¶ 61-62. Thus, even assuming that the 2015 Plan imposed significant

limitations on Committee Defendants, because Plaintiff alleges that 2015 Awards were issued in

circumvention of these limitations, the 2015 Awards cannot enjoy the benefits of *de facto*

shareholder ratification. Defendants have not carried their burden to establish a ratification

affirmative defense on this motion to dismiss. Accordingly, the entire fairness standard applies to

the issuance of the 2015 Awards by Committee Defendants, rather than the business judgment standard.

To sum up, to survive this motion to dismiss, Plaintiff must allege facts satisfying the business judgment standard as to his claim for breach of fiduciary duty against Recipient Defendants, but he must only allege facts satisfying the entire fairness standard for the same claim against Committee Defendants. For the reasons set forth below, I find that Plaintiff has failed to state a claim for breach of fiduciary duty against Recipient Defendants, but has sufficiently pled a breach of fiduciary duty claim against Committee Defendants.

In order to rebut the business judgment presumption, and state a claim against Recipient Defendants for receiving the allegedly spring-loaded 2015 Awards, Plaintiff must plead that "these individuals knew or, absent recklessness, should have known that the grants violated the stockholder-approved option plans." *Weiss v. Swanson*, 948 A.2d 433, 449 (Del. Ch. 2008). Furthermore, under this standard, to assert that the 2015 Awards violated the 2015 Plan on a spring-loading theory, Plaintiff must allege that the Compensation Committee "(a) possessed material non-public information soon to be released that would impact the company's share price, and (b) issued those options with the intent to circumvent otherwise valid shareholder-approved restrictions upon the exercise price of the options." *In re Tyson Foods, Inc. Consol. S'holder Litig.*, 919 A.2d 563, 593 (Del. Ch. 2007). In contrast, to state a claim against Committee Defendants under the entire fairness standard, Plaintiff need only allege "some facts that tend to show" that their issuance of the 2015 Awards "was not fair" to Advaxis. *Calma*, 114 A.3d at 589.

In that regard, beyond conclusory statements that "each defendant acted with knowledge of the primary wrongdoing," Compl. ¶ 37, Plaintiff pleads no facts directly demonstrating that

34

any Recipient Defendants knew the 2015 Awards were spring-loaded. Instead, Plaintiff claims that Defendants' knowledge and intent to spring-load the awards can be inferred based on the following alleged facts: (1) the 2015 Awards were much larger than the compensation previously granted to Advaxis' directors; (2) at the time the 2015 Awards were issued, the non-executive directors had already received their compensation for the 2015 fiscal year, pursuant to the 2013 Compensation Policy; (3) rather than wait for the Advaxis stockholder to approve the 2015 Plan before issuing the 2015 Awards, Committee Defendants issued the 2015 Awards contingent on stockholder approval of the 2015 Plan; and (4) the April Disclosures were made suspiciously soon after the 2015 Awards were granted. *Id.* at ¶ 57. In sum, Plaintiff asserts that "[t]he only reasonable conclusion [that can be drawn] from the timing of the March 30 equity grant is that the Board purposefully awarded the equity to take advantage of a known jump in stock price." *Id.* at ¶ 57. Additionally, Plaintiff alleges that the 2015 Awards provide an average compensation of $683,616 to each non-executive Director Defendant, which is "more than double the Board's salary for the previous year of $258,622 per director, on average" and is "more than the average amount that the Company's peers paid their directors, which was $245,751 in 2014." *Id.* at ¶¶ 70-71.

Based solely on these allegations, the Court cannot plausibly infer that Recipient Defendants knew or, absent recklessness, should have known that the 2015 Awards violated the 2015 Plan. Importantly, any suspicions raised as to the timing and manner in which the 2015 Awards were issued, only speak to choices made by Committee Defendants, not Recipient Defendants. Without providing any supporting allegations, Plaintiff asks the Court to make an inferential leap -- that Committee Defendants and Recipient Defendants "conspired with one another in furtherance of their common plan or design" to spring-load the options. *See id.* at ¶ 34.

Furthermore, Plaintiff alleges no facts indicating that the information in the April Disclosures was the kind of information that each individual Recipient Defendant would have been made privy to in the course of his duties, weeks before such information was disclosed to the public. Therefore, Plaintiff fails to allege facts indicating that Recipient Defendants knew, or should have known, that the 2015 Awards were improper when they accepted them. Consequently, Plaintiff has failed to state a claim for breach of fiduciary duty as to Recipient Defendants.

However, as to Committee Defendants, Plaintiff's allegations succeed in raising suspicions regarding the propriety of the 2015 Awards, and tend to show that their decision to issue the awards was not fair to Advaxis. *See Cede & Co. v. Technicolor*, 634 A.2d 345, 361 (Del. 1993) (Entire fairness is "the product of both fair dealing <u>and</u> fair price.") (emphasis in original). Thus, under the entire fairness standard, Plaintiff has alleged sufficient facts to bring a breach of fiduciary duty claim against Committee Defendants.

Accordingly, Plaintiff's breach of fiduciary duty claim against Recipient Defendants is dismissed without prejudice, but his breach of fiduciary duty claim against Committee Defendants may proceed.

### D.  Count III - Waste of Corporate Assets

Plaintiff asserts a waste of corporate assets claim against Defendants for "failing to consider the interests of the Company and its public stockholders and instead [giving] themselves spring-loaded options," as well as "paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty." Compl. ¶¶ 96-97. Defendants contend, however, that Plaintiff fails to allege facts which "show that the compensation awarded provided no benefit to the Company." Defs.' Supp. Br. at 45.

36

"[T]he doctrine of waste is a residual protection for stockholders that polices the outer boundaries of the broad field of discretion afforded directors by the business judgment rule." *Sample v. Morgan*, 914 A.2d 647, 669 (Del. Ch. 2007). "A board's decisions do not constitute corporate waste unless they are exceptionally one-sided." *White v. Panic*, 783 A.2d 543, 554 (Del. 2001). Accordingly, the Delaware Supreme Court has defined "waste" to mean "an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade." *Id*. "As a practical matter, a stockholder plaintiff must generally show that the board irrationally squander[ed] corporate assets - for example, where the challenged transaction served no corporate purpose or where the corporation received no consideration at all." *Id*. (quotations omitted). The Delaware courts have described the waste standard as "an extreme test, very rarely satisfied by a shareholder plaintiff, because if under the circumstances any reasonable person might conclude that the deal made sense, then the judicial inquiry ends." *Zupnick v. Goizueta*, 698 A.2d 384, 387 (Del. Ch. 1997).

Here, Plaintiff has failed to allege facts satisfying this extremely stringent standard. Plaintiff appears to rely on *Weiss v. Swanson* to argue that a claim for breach of fiduciary duty for spring-loading options is also, by definition, a claim for waste. Pls.' Opp'n Br. at 46 (citing *Weiss*, 948 A.2d at 450). However, *Weiss* does not stand for this proposition. *See Weiss*, 948 A.2d at 450. In *Weiss*, the plaintiff stockholder brought a derivative suit against the directors and officers of a Delaware corporation for a long-running spring-loading scheme, under which the board routinely granted options prior to quarterly earnings releases containing positive information, and after releases containing negative information. *Id.* at 439-40. The *Weiss* court found that the complaint contained sufficient allegations to rebut the business judgment rule and establish "that [1] the challenged grants were given pursuant to an options plan, and . . . [2] [the]

directors who approved the grants (a) possessed material non-public information soon to be released that would affect the company's share price, and (b) issued options with an intent to circumvent otherwise valid stockholder-approved restrictions upon the exercise price of the options." *Id.* at 441 n. 21. Moreover, the *Weiss* court found that the plaintiff had sufficiently alleged that the "grants were approved without any valid purpose" and "that the defendants should not have received any of the timed options." *Id.* at 450. Based on these allegations, the *Weiss* court concluded that the plaintiff had stated a claim for waste.[15] *Weiss*, 948 A.2d at 450.

Conversely, here, Plaintiff has failed to overcome the business judgment standard with regard to his claim against Recipient Defendants for breach of fiduciary duty. Moreover, although he has alleged sufficient facts to "tend to show" that the issuance of the 2015 Awards by Committee Defendants was not entirely fair to the company, he has not alleged facts which plausibly indicate, that the 2015 Awards "served no corporate purpose" or that the compensation that Advaxis received in exchange for the options (Defendants' work for the Company) was so "disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade." *See Calma*, 114 A.3d at 592 (finding that plaintiff had stated a claim under the entire fairness standard for breach of fiduciary duty arising from excessive compensation of non-employee directors, but that plaintiff had not stated a claim for waste arising from the same allegations). Accordingly, Plaintiff's claim against Defendants for waste is dismissed without prejudice.

---

[15] I note that the waste standard applied by the *Weiss* court appears to be somewhat broader than the standard for waste enunciated by the Delaware Supreme Court. The *Weiss* court examined whether there was any "reasonably conceivable set of facts under which the plaintiff could prove a claim of waste," *Weiss*, 948 A.2d at 450, while the standard outlined by the Delaware Supreme Court examines whether the plaintiff has plausibly alleged that there was "an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade," *White*, 783 A.2d at 554.

### E.  Count IV - Unjust Enrichment

Plaintiff maintains that Defendants were unjustly enriched "as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Advaxis." Compl. ¶ 101. The Delaware Supreme Court defines "[u]njust enrichment" as "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010) (quoting *Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060, 1062 (Del. 1988)). "The elements of unjust enrichment are: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law." *Nemec*, 991 A.2d at 1130. At the pleadings stage, Delaware courts will frequently treat "an unjust enrichment claim that is entirely duplicative of a breach of fiduciary duty claim . . . 'in the same manner [as the breach of fiduciary duty claim] when resolving a motion to dismiss.'" *Calma*, 114 A.3d at 591 (quoting *Frank v. Elgamal,* Civ. No. 6120-VCN, 2014 Del. Ch. LEXIS 37, at *105 (Del. Ch. Mar. 10, 2014)) (collecting cases).

Therefore, because Plaintiff's claim for unjust enrichment is directly derived from his claim for breach of fiduciary duty, the former necessarily rises and falls with the latter. Indeed, Defendants' sole argument as to why this claim should be dismissed is that "because the Complaint fails to allege sufficient facts to state a claim for relief for a breach of fiduciary duty, the unjust enrichment claim must also be dismissed with prejudice." Defs.' Supp. Br. 49. Thus, because I have determined that Plaintiff has stated a claim for breach of fiduciary duty against Committee Defendants, but not against Recipient Defendants, he has sufficiently stated a claim for unjust enrichment against Committee Defendants, but not against Recipient Defendants.

Accordingly, Plaintiff's claim for unjust enrichment against Recipient Defendants is dismissed without prejudice, but the unjust enrichment claim against Committee Defendants shall proceed.

## IV.  Conclusion

For the foregoing reasons, the following claims are dismissed without prejudice: the Section 14(a) claim (Count I) against Director Defendants; the breach of fiduciary duty claim (Count II) against Recipient Defendants; the waste claim (Count III) against all Defendants; and the unjust enrichment claim (Count IV) against Recipient Defendants. Defendants' motion to dismiss, pursuant to Rule 12(b)(6), is denied as to Plaintiff's claims for breach of fiduciary duty (Count II) and unjust enrichment (Count IV) against Committee Defendants. Furthermore, Defendants' motion to dismiss or stay the case pursuant to the *Colorado River* abstention doctrine is denied. Plaintiff is given leave to amend the Complaint, within thirty days, to cure the deficiencies identified in this Opinion.

Date: May 23, 2016

/s/ Freda L. Wolfson
Freda L. Wolfson
U.S. District Judge